WALKER *v.* ROSE.

Opinion delivered May 22, 1922.

1. LANDLORD AND TENANT—LIEN FOR ADVANCES.—Where a landlord directed a merchant to furnish supplies to the tenant, for which the landlord agreed to pay and subsequently did pay, the landlord in effect furnished the supplies to the tenant, and is entitled to a preference lien therefor, under Crawford & Moses' Dig., § 6890.

2. LANDLORD AND TENANT—INNOCENT PURCHASERS OF CROP.—Purchasers of cotton who bought it in the market near where it was grown without making inquiry as to where it was grown or whether there was an outstanding landlord's lien, were not innocent purchasers.

3. LANDLORD AND TENANT—CONVERSION OF CROP SUBJECT TO LIEN.—Testimony that the officers of a bank knew that landlord had a lien on his tenant's crop, and directed the tenant to sell his cotton in another State, credited drafts drawn on the purchaser to the tenant's account, and accepted from him checks on that account for the satisfaction of his indebtedness to the bank, *held* to show a conversion of the proceeds of the cotton to the bank's own use, rendering the bank liable to the landlord for the amount so converted.

Appeal from Mississippi Chancery Court, Osceola District; *Archer Wheatley,* Chancellor; modified.

*J. T. Coston,* for appellant.

*Driver & Simpson,* for appellee.

WOOD, J. R. C. Rose rented to J. A. Walker a certain tract of land in Mississippi County, Arkansas, for the

year 1919. On February 16, 1919, Walker executed his note to the Bank of Osceola (hereafter called bank) for the sum of $1,600, which was due November 15, 1915. Walker and Rose also executed a note to the bank on April 12, 1919, in the sum of $400, payable November 15, 1919, and Walker, on the 17th of September, executed a note to the bank in the sum of $50. The note for $1,600 was secured by a mortgage on certain personal property and the crops to be grown by Walker on the lands rented from Rose. At the close of the crop season Walker sold two bales of the cotton raised on the land to J. R. Miller for $351.12, and to the Hale Bros. other cotton grown on the lands for the sum of $1,455.95. The purchasers gave Walker checks for the respective amounts of the purchase price of the cotton, and he deposited these checks to his individual credit in the bank. Walker also shipped seven bales of the cotton to the J. T. Fargason Company, cotton factors at Memphis, Tennessee, which it sold for the sum of $311.11, for which Walker drew drafts and deposited the same in the bank to his credit.

This action was instituted by Rose against Walker, Miller, Hale Bros. and the bank to enforce a landlord's lien for rents and supplies amounting in the aggregate to the sum of $1,626.76. Rose prayed judgment against Walker for the amount alleged to be due him for rents and supplies, and alleged that the bank had received proceeds from the sale of cotton on which he had a lien for more than the amount due by Walker to Rose, and that the bank at the time it received the proceeds had knowledge that same were from the sale of cotton on which Rose had a lien. He also alleged that Miller and Hale Bros. had knowledge of the fact that Rose had a lien on the same for rents and supplies at the time they purchased the cotton from Walker.

The bank and Walker answered, denying the allegations of the complaint and denying liability. They set up also the mortgage of Walker to the bank, and that the amount advanced by the bank to Walker under the mort-

gage was used by Walker in making his crops. They further set up that the bank had advanced to Walker the sum of $400 upon a note which was endorsed by Rose, for which he was liable to the bank and estopped from claiming the bank was indebted to him for such amount.

Miller and Hale Bros. filed separate answers, in which they denied the allegations of the complaint, but set up that, if they purchased the cotton from Walker, they did so in the usual course of business and had no notice that Rose had any lien on the same. They therefore denied that they were indebted to Rose in any amount and prayed that the complaint as to them be dismissed. They also set up that the bank received the proceeds of the cotton purchased by them from Walker, and prayed that, in the event the court should find against them, or either of them, in favor of Rose, they in turn should have judgment against the bank.

Walker made default. The court found that he was indebted to Rose in the sum of $1,468.04, made up of the following sums:

| | |
|---|---:|
| Cash rent | $200.00 |
| 1/4 of the cotton | 485.00 |
| 1/4 rebate | 45.74 |
| Supplies | 113.85 |
| Brickey account | 223.35 |
| Bank of Osceola | 400.00 |

The court also found that the bank had furnished Walker the sum of $400 evidenced by a note on which Rose was the surety, and that Rose had not paid this note. The court further found that Walker had sold to Miller cotton raised on Rose's land during the year 1919 in the sum of $351.12; and had sold cotton to Hale Bros. for the sum of $1,455.94; that these purchases were made with full knowledge of the fact that plaintiff had a lien on the cotton for rents and supplies; that the proceeds were deposited by Walker in the bank, and that the bank had full knowledge that Rose had a lien on the proceeds for his rents and supplies; that the bank converted to its

own use a part of such proceeds amounting to more than Walker's indebtedness to Rose. The court further found that neither Miller nor Hale Bros: were innocent purchasers, and that the bank was liable as for conversion. The court gave the bank credit for the sum of $400, the amount of Walker's note on which Rose was surety. A decree was rendered in favor of Rose against Walker, the bank, and Hale Bros. in the sum of $1,068.04, with six per cent. interest thereon from December 1, 1919, and against Miller in the sum of $351.12. The court also decreed that Walker was primarily liable, and that Rose should proceed first against Walker and then against the bank before issuing execution against Hale Bros. and J. R. Miller, whose liability it adjudged to be inferior to that of the bank. From that decree is this appeal.

1. The court found that the appellee was entitled to a lien on the crops for the item of $223.35, the amount paid by him to Brickey Mercantile Company for supplies furnished Walker. (The undisputed proof shows that this item should be $233.35). E. E. Driver, the cashier of the bank, testified, among other things, that when Walker executed the note and mortgage to the bank, he showed Driver the lease contract agreement he had with Rose for the rent of the land. The cashier therefore knew that Walker was the tenant of Rose. The bank took the mortgage upon Walker's chattels and the crops to be grown on Rose's land and made advances to him under that mortgage. Rose testified that he talked with one of the directors of the bank, and that he understood from him that the bank, in addition to what Walker already owed it, furnished Walker about $600; that amount was not sufficient to complete the cultivation of Walker's crops. The bank refused to furnish Walker any more money. The appellee became responsible to the Brickey Mercantile Company in the sum of $335.35, advances made by it of money and supplies and used by Walker in the cultivation of his crops on appellee's land. The appellee paid this amount to the Brickey Mercantile Company.

The facts justified a finding that the money and supplies furnished through the Brickey Mercantile Company were in reality furnished by the appellee. The statute, in such cases, expressly gives the landlord "preference over any mortgage or other conveyance of such crop made by such tenant." Sec. 6890, C. & M. Digest. This is not a case of a landlord becoming a mere surety for his tenant, as was the case in *Coffman & Wilson* v. *Underwood,* 83 Ark. 118, upon which counsel for appellants relies; but the facts here warrant the conclusion that appellee himself was responsible primarily to the Brickey Mercantile Company for the advances and supplies made by it to Walker to make his crop.

In *Forster* v. *Bradney,* 143 Ark. 320, we held: "A landlord has a lien on his tenant's crop for the purchase price of supplies, the payment of which he had guaranteed, though he had not actually paid for them." Under the facts it is precisely the same as if the appellee had furnished the money and supplies himself. Under such a state of facts no contractual rights of a mortgagee under a mortgage executed to him by a tenant on crops can intervene to deprive a landlord of his lien under the above statute. Where the landlord, through another, furnishes the tenant supplies to make the crop, it is the same as if he furnished them directly, and he brings himself by such proof within the terms of the above statute.

2. It is not contended by the appellants that Miller and Hale Bros. were innocent purchasers. It could serve no useful purpose therefore to set forth and discuss in detail the testimony bearing upon this issue. Let it suffice to say that, while the testimony of one of the Hales and Miller was to the effect that when they bought the cotton from Walker they did not know that Walker was renting from Rose and that the cotton was grown on Rose's land, that they did not know that Rose had a claim on the cotton until after they bought the same; nevertheless they admitted that they made no inquiry of Walker as to

where the cotton was grown or whether there was any outstanding landlord's lien against the same. They purchased the cotton by sample and from ginner's receipts, and made no further investigation. They were cotton buyers of experience and were buying cotton at Osceola, where Rose resided, and in the Osceola district where the land was situated. Therefore the court correctly ruled that Miller and Hale Bros. were not innocent purchasers, and the decree against them in favor of the appellee for the value of the cotton purchased by them from Walker was correct. *Hunter* v. *Matthews,* 67 Ark. 364; *Noe* v. *Layton,* 69 Ark. 551; *Jacobson* v. *Atkins,* 103 Ark. 91; see also, *Lynch* v. *Mackey,* 151 Ark. 145.

3. The court found that the bank knew that the cotton was subject to a landlord's lien, and that in effect Walker had no right to the funds deposited; that he was, to the extent of appellee's lien, a trustee of such funds. These findings of the court are supported by a decided preponderance of the evidence. The cashier of the bank himself testified that, after Walker made the contract to move on Rose's land, the bank took a mortgage upon his chattels and the crops to be made on that land. He further testified that when Walker drew drafts on the Fargason Company, or sold cotton to Hale Bros. and Miller, and the checks came to the bank, witness presumed that they were the proceeds of the sales of the cotton raised by Walker that year. When the checks of Miller and Hale Bros. were brought to the bank, and Walker gave the bank checks on his account to pay the mortgage to the bank, witness believed that they were the proceeds of the cotton that he had raised that year on Rose's land. The bank got practically all of the proceeds of the checks of Hale Bros. and Miller. This witness further testified as follows: "It was my fault that Walker did ship the cotton. I instructed him to ship the cotton. I know that some of it was shipped. I know that J. T. Fargason Co. was shipped several bales. Mr. Walker drew various drafts on J. T. Fargason Co., to whom he had shipped

cotton, and we received those drafts. The bank had nothing to do with Walker's shipment (to Fargason Co.) more than to advise him that we thought it was the best thing to do. We accepted the drafts that he drew and gave him credit on his deposit for the same. The shipping of the cotton was left to Mr. Walker. I would not have been willing for him to ship it to Rose's credit."

The testimony further shows that, after the checks and the drafts were deposited to Walker's credit in the bank, he then drew checks on his account in favor of the bank to pay his preexisting indebtedness to the bank. The above testimony comes from the bank's own agents, its cashier and assistant cashier. Such being their testimony, the court was clearly correct in the above findings. When the bank, through its cashier, advised Walker to ship cotton to a cotton factor out of the State, the cashier knowing at the time that the appellee had a lien on such cotton for rents and supplies, and when the cashier received from Walker a draft on the factor for the proceeds of such cotton and used such drafts in paying Walker's indebtedness, the bank by these acts converted to its own use the proceeds of the cotton with full knowledge of the fact that the appellee had a lien upon such cotton, or its proceeds, for rents and supplies. The decree of the court holding the bank liable to the appellee for such proceeds under the circumstances was correct as disclosed by the above proof. Having knowledge of the appellee's lien, it must be held that the conduct of the bank was tantamount to a destruction by it of such lien. *Merchants' & Planters' Bank* v. *Meyer,* 56 Ark. 499, 505; *Carroll County Bank* v. *Rhodes.* 69 Ark. 43-48; *Boone County Bank* v. *Byrum,* 68 Ark. 71-74; *Blanton* v. *First National Bank of Forrest City,* 136 Ark. 441.

It follows from what we have already said that the court ruled correctly in holding that the note of $400 executed by Walker and Rose to the bank should be considered as paid and canceled as of the date of the conversion by the bank of the proceeds of sales of the cotton

upon which the appellee had a lien. The undisputed tes·timony shows that, by a misprision, the Brickey item which entered into the decree should have been $233.35 instead of $223.35 as found by the court.

We therefore treat the decree as if it had been corrected by stipulation of the parties in the trial court and rendered for the sum of $1,078.04. The decree for this amount is in all things correct, and hence it is affirmed.